UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KHARI MCKOY,<br><br>　　　　Defendant. | CRIMINAL NO. 24-CR-411 (TJK) |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

　　The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing in the above-referenced case. For the reasons set forth below, the government recommends a sentence of 87 months of incarceration, followed by ten years of supervised release.

**FACTUAL AND PROCEDURAL BACKGROUND**

　　The National Center for Missing and Exploited Children (NCMEC) is a non-profit 501(c)(3) organization that serves as a national clearinghouse and resource center for families, victims, private organizations, law enforcement, and the public on missing and sexually exploited children. NCMEC operates a CyberTipline and Child Victim Identification program. Through the Cyber Tipline, Internet Service Providers (ISP), Electronic Service Providers (ESP), and individual persons may notify NCMEC of online child sexual abuse images. NCMEC makes information submitted to the CyberTipline and Child Victim Identification Program available to law enforcement agencies.

　　On January 16, 2024, and January 17, 2024, Google LLC reported to NCMEC that the defendant's Google accounts kharimckoy@gmail.com and kharimckoy2@gmail.com had uploaded one thousand and eight (1008) files of suspected child sexual abuse material (CSAM)

to the Google Photos and Google Drive applications of these accounts. This information was memorialized in NCMEC Cybertip #184639452 (January 16, 2024) and NCMEC Cybertip #184748684 (January 17, 2024). A member of the Federal Bureau of Investigation (FBI) and Metropolitan Police Department's (MPD) Child Exploitation and Human Trafficking Task Force (CEHTTF) reviewed the files included in the CyberTips and determined that most of the files depicted prepubescent boys engaged in sexual acts, sexual contacts, masturbation, or lewd and lascivious displays of their genitals.

On March 13, 2024, a member of CEHTTF obtained a search warrant for the defendant's Google accounts kharimckoy@gmail.com and kharimckoy2@gmail.com, including the photos and videos located within the Google Drive and Google Photos applications of those accounts. The CEHTTF reviewed the material in the accounts and observed child pornography within the Google Photos application of the kharimckoy2@gmail.com account. For example, one video found in the account depicted a naked prepubescent boy laying on his back while an adult man manipulated the boy's penis with his hand, placed the boy's penis in his mouth, and rubbed the boy's penis with his tongue.

A member of CEHTTF also located fifteen photos within the defendant's Google Photos application of this account with metadata resolving to the XXXX block of Cleary Lane in Bowie, Maryland. The metadata for these files also indicated that the files were created with a Samsung cellular phone (Model SM-G928V) and were created in the summer of 2016 and the spring of 2017. These photos depicted a young African American male who appeared to be sleeping in bed wearing underwear or jeans. The photos are focused on the buttocks of the apparent minor and were saved in a folder labeled "Ass." CEHTTF members also located twenty-one videos within the Google Photos application that were saved within a folder labeled "Ass." These videos

2

appeared to depict the same young sleeping male who was depicted in the images described above. The videos were recorded in a "selfie style" and showed the individual recording the video groping the sleeping male's penis and buttocks over and under his underwear and penetrating his mouth with the sleeping male's penis. The sleeping male did not appear to wake up during the recording of these videos. In one of the videos, the individual recording the video placed the sleeping boy's penis inside his mouth and a profile of his face is visible in the video while he is holding the sleeping male's penis.

On August 14, 2024, at approximately 6:10 AM, members of the CEHTTF executed a search of the defendant's residence at XX R Street NW, #X in Washington, D.C. The members located McKoy within the residence and found that he was the only resident at the premise. Members of the CEHTTF conducted a voluntary, audio recorded interview of McKoy while the rest of the search team completed the residential search. Before the interview, McKoy was advised that he was not under arrest and that he did not have to answer questions. McKoy was repeatedly told that he was free to leave and that he could end the interview at any time.

During the interview, McKoy acknowledged that he uses the account kharimckoy@gmail.com. McKoy further stated that he created the account kharimckoy2@gmail.com but denied that he was actively using the second account. McKoy initially told the officers that his kharimckoy2@gmail.com may have been "hacked." Later, during the interview, however, McKoy acknowledged that he was the user of kharimckoy@gmail.com and he admitted that he stored child pornography within that account.

During the interview, members of CEHTTF showed McKoy two images which were screenshots from the videos discussed above, which were found in the Google Drive of the kharimckoy2@gmail.com account and which appeared to depict the defendant placing the penis

of a sleeping male in his mouth.   The officers asked McKoy if he recognized the sleeping male depicted in the images, and McKoy told the officers that the images were of his half-bother, who he identified by the nickname "Mickie."  McKoy told the officers that he made the video with an old phone that he no longer possessed, while he was living in the basement of a home on Cleary Lane in Bowie, Maryland.  McKoy said that he did not believe his brother ever woke up when he was sexually assaulting him.  McKoy acknowledged that his brother was under 18 years old at the time that the videos were produced and that he was approximately 21 or 22 years old when he made the videos. McKoy also stated that he had been collecting child pornography since he made the videos involving his half-brother and that he would store the child pornography on his kharimckoy2@gmail.com account.[1]

Members of CEHTTF searched McKoy's residence and recovered nine digital devices, including a Seagate External hard drive that was found in the nightstand next to a bed in the Defendant's bedroom and a Samsung tablet that was recovered from the floor of the apartment. Officers on the scene were able to preview the contents of the hard drive and observed several of the video files that were located on the kharimckoy2@gmail.com Google Photos Drive, which appeared to depict the sexual abuse of the defendant's half-brother and which were described above.  Within the hard drive, these videos were stored in a folder labeled "M" which was a sub-folder of another folder labeled "New folder."  The metadata on the files indicated that they were

---

[1] Law enforcement from Prince George's County, Maryland, interviewed the Defendant's half-brother in September 2024, and showed him a screenshot of the video discussed above.  The defendant's brother "Mickie" said that he could not tell if it was himself that was depicted in the video, or another half-brother of the defendant, who was approximately 18 years old in 2016, but who is autistic and non-verbal.  The defendant's brother also told police that he had no memory of being sexually assaulted by the defendant or of that video being produced. The father of the defendant and both of his half-brothers was also shown the screenshot from the video depicting the sleeping male, and he also said that the defendant's two half-brothers looked alike at the time the video was taken, and he could not say for sure which of the brothers was depicted in the screenshot.

created in 2016 or 2017. At that time, the defendant's half-brother was 14 or 15 years old and the defendant was 20 or 21 years old. In addition to these files, the hard drive contained many other videos depicting prepubescent children engaged in sexual acts and/or sexual contacts. These files were located in folders labeled "Fav", "Boy", and/or "Boys."

Members of CEHTTF extracted and reviewed two of the devices recovered during the search of the Defendant's residence, a Samsung tablet (FBI evidence item 1B4) and a Seagate hard drive (FBI evidence item 1B5). The review of the devices revealed more than two thousand (2,000) child pornography images and/or videos on the devices. Some of the images and videos appeared to be the same images and videos that were located in the Google accounts associated with the defendant's kharimckoy2@gmail.com account. A member of CEHTTF reviewed the files and noted that many of the images and videos depicted pre-pubescent children engaged in sexual acts. Specifically, the following videos were among the files reviewed on the device:

- File Name: fb136d8a-8ef7-42e1-8810-086cddf6875c.mp4 is a video file depicting a nude pre-pubescent female child being anally penetrated by an adult man's penis.

- File Name: ab2fc587-c73d-4276-99e0-a0ea8b830557.mp4 is a video file depicting a nude prepubescent male child laying on his back with his knees pushed back to his chest being anally penetrated by an adult man's penis.

- File Name 752becfe-87ae-40fb-8040-48b9d7e339d9.mp4 is a video file depicting a minor male wearing a yellow shirt and no pants or underwear, resting on his elbows and knees while being anally penetrated from behind by an adult man's penis. The minor male is grimacing in pain while being assaulted.

- File Name: VID-20150120-WA0084.mp4 is a video file depicting a toddler boy laying on his back on a blue patterned blanket with his legs spread apart to expose his penis and anus while an adult man rubs the boy's anus with his penis and penetrates the boy's anus with the tip of his penis until the adult male ejaculates in and on the boy's body.

- File Name: 336e65e1-c808-408f-8e2c-eb74aa202477.mp4 is a video file depicting a naked prepubescent boy who appears to be approximately four or five years old being anally penetrated by an adult man's penis.

On August 14, 2024, the defendant was arrested and charged by criminal complaint with Possession of Child Pornography, in violation of violation of 18 U.S.C. § 2252(a)(4)(B). On September 11, 2024, a federal grand jury returned a one-count indictment charging the defendant with Possession of Child Pornography. On January 30, 2025, the defendant pled guilty to one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B).

## DISCUSSION AND RECOMMENDATION

### I.     Generally Applicable Legal Principles

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant

6

with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

## II.   The U.S. Sentencing Commission's 2012 and 2021 Reports on Child Pornography Offenses

In 2012 and 2021, the U.S. Sentencing Commission published reports to Congress analyzing federal sentences in both production and non-production child pornography offenses. The reports criticize certain enhancements in the current Guidelines and recommend three categories of aggravating factors that courts should consider when imposing sentences in non-production cases: content, community, and conduct. The Commission further explained how these factors should affect a defendant's sentence:

> The presence of aggravating factors from any of these three categories, even without the presence of any aggravating factors from the other two categories, warrants enhanced punishment depending on the degree that aggravating factors from that category are present in a particular case. The presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category.

U.S. Sent'g Comm'n, Report to Congress: Federal Child Pornography Offenses (2012) at 321 (hereinafter 2012 Report).

*Content*

As outlined in the 2012 Report, this factor directs courts to evaluate the content of an offender's collection and behavior "in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized,

7

maintained, and protected his collection over time, including through the use of sophisticated technology." 2012 Report at 320.

*Community*

This factor directs the Court to evaluate "the degree of an offender's engagement with other offenders — in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation." 2012 Report at 320. The Commission distinguishes between impersonal file-sharing exchanges, which involve "anonymous, indiscriminate" open exchange and no two-way communication, versus "personal" distribution in closed groups, involving two-way communication concerning child pornography and child exploitation. *Id.* at 313-14, 324.

*Conduct*

The third factor asks courts to assess whether an offender "has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense." 2012 Report at 320. Notably, the Commission recommends that, in addition to criminal offenses, courts consider "non-criminal acts of sexually deviant behavior" because such behavior also indicates sexual dangerousness. *Id.* at. 325.

### III. Sentencing Guidelines Calculation

The government agrees with the Guidelines calculation set forth in the Presentence Report, estimating a final offense level of 28 and a Guidelines range of 78 to 97 months of incarceration.

### IV. Government's Sentencing Recommendation

The government recommends a Guidelines sentence of 87 months of incarceration, to be followed by ten years of supervised release. It recognizes the presence of aggravating factors identified by the U.S. Sentencing Commission and also aligns with the sentencing factors outlined in 18 U.S.C. § 3553(a).

**V.     The § 3553(a) Factors Support a Sentence of 87 Months of Incarceration.**

    A.     <u>Nature and Circumstances of the Offense</u>

The defendant's conduct is extremely serious. The defendant possessed thousands of images of child sexual abuse material (CSAM), including videos that depict anal penetration of prepubescent children and videos that depict children in pain. The defendant's spread his collection over multiple online accounts and physical storage devices. The defendant had even organized his collection, separating out files in specific folders. In addition to his collection of pre-existing CSAM, the defendant also had multiple media files in which he appears to sexually assault a sleeping family member who is fourteen or fifteen years old. In the media, the defendant gropes the boy's penis and buttocks and uses the sleeping boy's penis to penetrate his mouth.

Moreover, the government notes that the defendant's conduct exhibits aggravating factors discussed by the U.S. Sentencing Commission in its 2012 and 2021 reports – namely, content and conduct. The defendant's collection of CSAM is extremely concerning, in its size, organization, and the sexual acts being depicted. But, as noted above, this is not a case in which the defendant merely possessed CSAM for his own sexual interests. His collection shows that he sexually assaulted a family member and recorded that abuse for his own future sexual pleasure. This is precisely the kind of conduct that the Commission noted as an aggravating factor for sentencing purposes.

    B.     <u>History and Characteristics of the Defendant</u>

The defendant has no criminal history points. However, many of the defendant's personal characteristics that are described in his psychosexual evaluation raise concern. For example, the defendant "denied becoming sexually aroused by or masturbating to images of individuals younger than in their mid-teens" and denied attraction to prepubescent children. Psychosexual Evaluation

9

at 7. This statement appears to be the defendant's attempt at downplaying his actions. Out of the over one thousand images reported to NCMEC by Google, most of them depicted prepubescent boys. Likewise, law enforcement found that most of the files found on the defendant's personal storage devices depicted prepubescent children.

Notably, the defendant did not report any history of sexual or physical abuse, and while the evaluator noted that the defendant suffered from Attention-Deficit Hyperactivity Disorder (ADHD) as a child, he did not note severe mental illness. These facts are corroborated in the Presentence Report.

The defendant described his pornography usage as a compulsion. He reported that he was unable to reduce or limit his pornography use and admitted that he felt "addicted" to viewing pornography. Psychosexual Evaluation at 7. This compulsive behavior then led him to seek out younger content.

The evaluation also noted that the defendant had an average risk of sexual recidivism according to the Static-99R and a moderate risk on the Stable-2007.

C.   Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment for the Offense

Child pornography offenses are extremely serious because they result in perpetual harm to the most vulnerable victims, while simultaneously validating and normalizing the sexual exploitation of children. Courts across the country have recognized this:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.

> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions.

> Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of the defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012).[2]

When enacting mandatory minimum penalties for those who produce and traffic in the sexual abuse and exploitation of children, Congress similarly described the evil of child pornography:

> [W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996).

There is perhaps no greater invasion of privacy than that caused by the dissemination of child pornography. With a click of the button on a camera, the sexual abuse of these children is memorialized forever. It is terrible enough that a child must live with the memory of his or her initial abuse. It is hard to even comprehend how that child could then learn to cope with the fact

---

[2] *See also In re Amy Unknown*, 636 F.3d 190, 201 n.12 (5th Cir. 2011) (*citing United States v. Norris*, 159 F.3d 926 (5th Cir. 1998) (describing how the distribution of child pornography creates a marketplace for images of children, perpetuating abuse); *United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

that strangers everywhere are using the worst moments of that child's life to sexually gratify themselves and that he or she can do nothing to stop them from continuing to do so. The only recourse that these children have is the strong enforcement of the laws that hold these offenders accountable for the tremendous damage they have inflicted upon countless child victims.

Traffickers of child pornography, like the defendant, create a market and demand for materials depicting the sexual abuse and exploitation of real children. They contribute to the cycle of abuse and are in part responsible for the harm suffered by the children used to produce the materials in their collections. *See United States v. Goff,* 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography"). In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007). In other words, even if consumers of child pornography do not themselves molest children, their actions directly contribute to the abuse of children.

Here, the defendant made the conscious decision to build a collection of thousands of images and videos of CSAM, many of which depicted prepubescent children being anally and orally raped. Not only that, but the defendant sexually assaulted a family member and created CSAM of that assault. Significant incarceration is necessary to promote respect for the law, ensure just punishment, and to reflect the seriousness of the defendant's offenses.

D.      Adequate Deterrence and Protection of the Public

The possession and trafficking of child pornography endangers the public by encouraging the rape, violence, and abuse of children. In *United States v. Miller*, the Fifth Circuit stated:

> [R]eal children are being abused and violated when pornographic images are made. Without a market for such images, and without a strong appetite for more and more images exhibited by [defendant] and similarly situated defendants, there would be far fewer children who are injured and criminally assaulted in this way. If a handful of pornographic images taken twenty years ago were sufficient to satisfy the perverse desires of those who possess and traffic in child pornography, we would not have the huge industry that exists internationally today.

665 F.3d 114, 123 (5th Cir. 2011). The importance of deterrence with respect to child pornography offenses is well-established. Serious penalties for child pornography offenders decrease the number of participants in the market, which in turn decreases the need for its production:

> The greater the customer demand for child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

*Goldberg*, 491 F.3d at 672; *see also Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand"); *Goff*, 501 F.3d at 261 ("Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing."); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").

The defendant's sentence should be sufficient to deter not only the defendant from reoffending in the future, but also to deter the criminal conduct of others who engage in, or contemplate engaging in, the trafficking of child sexual abuse material. As stated in *Goldberg*, "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for trafficking in child pornography, the greater the customer demand for it and so the more will be produced." 491 F.3d at 672. *See also Goff*, 501 F.3d at 261 (stating in a child pornography possession case that "deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing"). The government's recommended sentence of 87 months of incarceration serves this purpose.

    E.    <u>Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities</u>

Section 3553(a)(6) requires courts to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records who have been found guilty of similar conduct." However, it "does not require the district court to avoid sentencing disparities between [ ]defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d 762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010).

Here, the U.S. Sentencing Commission's Judicial Sentencing Information shows that the average sentence length for individuals sentenced under U.S.S.G. § 2G2.2 with a final offense level of 28 and Criminal History Category I was 56 months during Fiscal Years 2020—2024. The median sentence length was 60 months. However, in the present case, the defendant also sexually

assault a minor family member and recorded the abuse. Given these additional aggravating factors, the government's recommendation of 87 months of incarceration does not create an unwarranted disparity.

    F.    <u>Restitution</u>

In child pornography cases, restitution is mandatory to any person "harmed as a result of" a defendant's crime. *See* 18 U.S.C. § 2259(a), (c); *see also United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution includes "the full amount of the victim's losses," which may include any costs incurred by the victim for:

    (A) Medical services relating to physical, psychiatric, or psychological care;

    (B) Physical and occupational therapy or rehabilitation;

    (C) Necessary transportation, temporary housing, and child care expenses;

    (D) Lost income;

    (E) Attorneys' fees, as well as other costs incurred; and

    (F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

Distribution of Child Pornography is a child pornography trafficking offense, as defined in 18 U.S.C. § 2259(c)(3). Therefore, the Court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is not less than $3,000. 18 U.S.C. § 2259(b)(2).

In *Paroline v. United States*, 134 S. Ct. 1740 (2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine

the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 134 S. Ct. at 1716. In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps.

First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 1722.

Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id*. at 1726-27. The Court recognized that in most child pornography possession cases, a victim's losses resulted from harm caused by the trafficking of his or her images by numerous "geographically and temporally distant offenders acting independently, and with whom the defendant had no contact." *Id.* at 1727. As a result, the Court held that:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id*. at 1725. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a token or nominal amount." *Id.* That is, in part, because a restitution order under § 2259 serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.*

16

Third, the Court provided sentencing courts with the guidance regarding how to determine the proper amount of restitution under this standard. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. at 1727-28. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*. at 1728. The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the defendant's relative causal role." *Id*. "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*. Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (2018).

Exhibit A contains the Victim Impact Statements received from children depicted in the materials possessed and traded by the defendant. Exhibits B through D contain restitution requests made the victims. As detailed in the victim impact statements and requests for restitution, these victims are seeking restitution for costs associated with attending psychotherapy and/or counseling, medications, loss of income, and for various medical expenses incurred as a result of the defendant's actions.

17

**CONCLUSION**

For the foregoing reasons, the government respectfully recommends that the defendant be sentenced to a term of incarceration of 87 months, followed by ten years of supervised release. Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. § 3553(a).

                Respectfully submitted,

                JEANINE FERRIS PIRRO
                UNITED STATES ATTORNEY

                */s/ Rachel Bohlen*
                Rachel Bohlen
                DC Bar No. 1010981
                Assistant United States Attorney
                601 D St NW
                Washington, DC 20530
                (202) 805-3575
                rachel.bohlen@usdoj.gov